

## Fourth Court of Appeals

### San Antonio, Texas

### MEMORANDUM OPINION

No. 04-25-00335-CV

**IN THE INTEREST OF T.I.P.** and I.O., Children,

From the 57th Judicial District Court, Bexar County, Texas
Trial Court No. 2023PA01717
Honorable Charles E. Montemayor, Judge Presiding

Opinion by:     Adrian A. Spears II, Justice

Sitting:          Lori I. Valenzuela, Justice
                  Adrian A. Spears II, Justice
                  Velia J. Meza, Justice

Delivered and Filed: November 12, 2025

AFFIRMED

N.B. and R.O. appeal from a judgment terminating their parental rights, arguing the evidence is legally and factually insufficient to support the trial court's essential findings.[1] To terminate parental rights under section 161.001 of the Texas Family Code, the Texas Department of Family and Protective Services had the burden to prove by clear and convincing evidence that N.B. and R.O.'s parental rights should be terminated under at least one of the statutory grounds in subsection 161.001(b)(1) and that termination of their parental rights was in the children's best

---

[1]To protect the identity of the minor children, we refer to the children and the parties by fictitious names, initials, or aliases. *See* TEX. FAM. CODE § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

interests. TEX. FAM. CODE § 161.001(b)(1), (2). After reviewing the evidence under the applicable standards of review, we affirm.

## BACKGROUND

On November 22, 2023, the Department filed suit to terminate N.B. and R.O.'s parental rights along with an affidavit in support of emergency removal of two children—T.I.P., a fourteen-year-old, and I.O., a newborn. At the time, N.B. was the mother of both children and their primary caretaker. R.O. was I.O.'s father. T.I.P.'s father was deceased. The trial court granted the Department's emergency removal request and appointed the Department the children's temporary sole managing conservator. The children were removed from N.B.'s care and placed with a relative.

Seventeen months later, on April 11, 2025, the trial court held a bench trial. The Department presented seven witnesses—an investigator; two caseworkers; a substance use program specialist; two licensed professional counselors; and the children's mother, N.B., who testified by Zoom. Ten exhibits were admitted into evidence, including the results of multiple drug tests performed on N.B.

### 1. Evidence about N.B.

The trial evidence showed that N.B. tested positive for amphetamines when she gave birth to I.O. on November 8, 2023. Her newborn, I.O., tested positive for amphetamines and the infant's meconium[2] tested positive for methamphetamines. A week after I.O.'s birth, a Department investigator, Jonathan Tatlow, visited N.B. in her home. When Tatlow asked N.B. how I.O. tested positive for illegal drugs, N.B. explained that she had taken over-the-counter cold and flu medications, such as Dayquil and Vicks, during her pregnancy. However, Sherrell Gibbs, a

---

[2]Meconium is the "[f]irst feces of a newborn infant, made up of salts, amniotic fluid, mucus, bile, and epithelial cells." TABER'S CYCLOPEDIC MEDICAL DICTIONARY (21st ed. 2009).

substance use program specialist, testified that such over-the-counter medications could not cause positive test results for amphetamines and methamphetamines. Gibbs also testified that methamphetamines are illegal to use without a prescription.

Despite using amphetamines and methamphetamines during her pregnancy, N.B. refused to work with the Department to create a safety plan for the children. N.B. also refused to allow the Department to interview her fourteen-year-old child, T.I.P., who was at home during the Department's initial visit.

After interviewing N.B., the Department tried to contact R.O. to see if I.O. could be placed with him, but R.O. did not respond. The Department ultimately reached the conclusion that neither N.B. nor R.O. could provide a safe, stable home for the children.

The drug test results admitted into evidence showed that N.B. tested positive for illegal drugs as follows: November 20, 2023—methamphetamines (hair); December 22, 2023—amphetamines and methamphetamines (hair); March 22, 2024—methamphetamines (hair); March 22, 2024—amphetamines and methamphetamines (nails); and August 29, 2024—amphetamines and methamphetamines (urine). The drug test results also showed that N.B. tested negative for illegal drugs on February 2, 2024; May 3, 2024; June 21, 2024; and August 2, 2024. All of N.B.'s negative test results were based on urine samples.[3]

A Department caseworker, Jacqueline Zelaya, testified that she was assigned to this case for about a year. The Department's major concerns about N.B. were her inability to maintain her sobriety and her failure to engage in individual therapy until successfully discharged.

---

[3]Gibbs testified that different types of samples provide different "detection windows," signaling drug use over varying periods of time. For methamphetamines, a urine sample provides a detection window of one to two days, and a hair sample provides a detection window of about 90 to 120 days.

Zelaya prepared a service plan for N.B., which required N.B. to refrain from alcohol and drug use;[4] engage in a drug assessment and follow all corresponding recommendations; and engage in a psychosocial assessment and attend and actively participate in individual counseling. N.B. completed a drug assessment, which established that N.B. needed outpatient drug treatment. N.B. completed an outpatient drug treatment program in May 2024. However, after completing drug treatment, N.B. continued to test positive for illegal drugs.[5]

Zelaya noted that N.B. appeared to maintain short periods of sobriety, but she was unable to maintain long-term sobriety. Because of N.B.'s continued illegal drug use, Zelaya told N.B. she needed to complete a second drug assessment and follow its recommendations, but N.B. refused to complete a second drug assessment. Zelaya further testified that she repeatedly offered to assist N.B. by providing transportation to drug testing facilities and by scheduling her drug testing after 5:00 p.m. to avoid conflicts with N.B.'s work schedule. N.B. either refused Zelaya's assistance or ignored Zelaya's offers altogether. Zelaya felt she did everything in her power to assist N.B. in being reunified with her children. She added that N.B. received extensions in this case, meaning that N.B. had more time to make progress than similarly situated parents.

Two months before trial, in February 2025, another Department caseworker, Carol Saldana, took over the case. According to Saldana, the Department requested drug testing from N.B. eight times between January 16, 2025 and March 15, 2025, but N.B. did not submit to any of these tests. Saldana testified that she informed N.B. that drug testing was the way to demonstrate

---

[4]The family service plan stated: "There is zero tolerance for illegal drug use and/or exposure to drugs. If [N.B.] refuses or fails to submit to a requested drug test . . . the Department will consider the results to be positive."

[5]N.B. also refused to participate in drug testing on multiple occasions, which supported an inference that she was avoiding drug testing because she was still using illegal drugs. *See In re M.M.*, No. 04-21-00463-CV, 2022 WL 1096381, at *4 (Tex. App.—San Antonio Apr. 13, 2022, no pet.) (providing that a parent's "failure to drug test is considered a positive test result under the law and supports an inference that she is still using drugs").

that she was maintaining her sobriety. Despite this conversation, N.B. continued to refuse to submit to drug testing.

The evidence also showed that by the time of trial, N.B. had not consistently engaged in and completed individual counseling. At the beginning of the case, N.B. told Zelaya she did not like her counselor. In response, Zelaya arranged for N.B. to have a new counselor, Victoria Caylor. At trial, Caylor testified that she provided counseling services to N.B. from March 13, 2024, to August 22, 2024. Caylor and N.B. met about three times a month. Caylor identified anxiety, substance abuse, domestic violence, parenting, poor decision-making, and a lack of accountability and responsibility as issues requiring N.B.'s attention. But Caylor felt that N.B. never addressed the "root" of these issues. Caylor further stated that she noticed that N.B. appeared to be pregnant, but N.B. denied that she was pregnant. Caylor later learned that N.B. was in fact pregnant. After not hearing from N.B. for about two months, Caylor unsuccessfully discharged N.B. from individual therapy.

Later, a caseworker arranged for N.B. to undergo therapy with a third counselor, Delilah Martinez. Because N.B. said that in-person counseling sessions were difficult for her to attend, Zelaya made sure that N.B.'s sessions with Martinez were virtual. Martinez testified that she began providing weekly counseling sessions to N.B. on February 6, 2025. By trial, N.B. missed three sessions with Martinez. Martinez's major concern was N.B. "not engaging in her substance abuse requirements." Martinez identified the need for N.B. to work on additional issues in counseling, including her history of domestic violence, her parenting skills, and her ability to make appropriate judgments regarding the welfare of her children. N.B. told Martinez that she was no longer in an abusive relationship, that she did have stable housing, and that she was working part-time as a

caregiver. By the time of trial, Martinez had not released N.B. from individual counseling, and Martinez did not believe that N.B. was ready to care for her children.

N.B. consistently visited the children while the case was pending. However, as Zelaya pointed out, the Department provided N.B. transportation to most of these visits. When the children were placed in Houston, N.B. visited them for two hours twice a month. When the children were placed in San Antonio, N.B. visited them for one hour once a week. All visits were supervised by the Department. During her visits, N.B. interacted appropriately with the children.

In October 2024, N.B. was charged with aggravated assault and aggravated kidnapping. Because of these charges, N.B. was in jail for two months. Zelaya testified that she was not sure the charges against N.B. were still pending or if they had been dismissed.

In her testimony, N.B. admitted that she was arrested for aggravated assault and aggravated kidnapping while this case was pending. N.B. also acknowledged that she was in a relationship with R.O. until March 2024, and that he was the father of her younger child, who was born while N.B. was in jail. When this baby was born, N.B. refused to allow drug testing on herself and her newborn baby.[6]

N.B. also admitted that T.I.P. and I.O. were removed because she tested positive for amphetamines at I.O.'s birth and then refused to agree to a safety plan to protect the children. N.B. further admitted that her last drug test, which was taken in August 2024, was positive for methamphetamines. In an attempt to explain her refusals to drug test, N.B. stated that "transportation [was] an issue," the testing sites were only open until 5:00 p.m., and she could not leave work to drug test.

---

[6]This child is the subject of a separate termination suit.

N.B. testified that she was sometimes confused about the expectations in this case. Specifically, N.B. complained that her service plan required her to complete parenting classes, but the trial court expressly told her she did not have to complete parenting classes. But N.B. confirmed that she was not confused about the requirement that she remain free from illegal drug use.

N.B. claimed that if she had known she was pregnant with I.O., she would not have used illegal drugs. N.B. also stated that her drug relapse was "very reckless."

N.B. criticized the Department for failing to meet some of T.I.P.'s needs while he was in the Department's care. According to N.B., the Department had not properly withdrawn T.I.P. from his home school, which prevented T.I.P.'s school credits from transferring when he moved to a different school district. As a result, T.I.P. was held back a grade for the first time in his life.

N.B. complained that T.I.P. was no longer taking his behavioral medications, which he had been taking for about a decade. N.B. also complained that both children's evaluations, referrals, and check-ups were outdated and "most of the permanency packet was blank."

N.B. asked the trial court not to terminate her parental rights, stating that she "loved her children" and she was "trying to hear the harm [she'd] done to them. You know, like where did I hurt them?" N.B. believed that she had maintained her sobriety and that she had done everything necessary to regain custody of her children.

### 2. Evidence about R.O.

The evidence showed that when the Department investigator, Tatlow, met with N.B. after I.O.'s birth, R.O. was present in the home, but he refused to meet with the investigator. Early on, the Department sought out R.O. as a potential placement for I.O., but R.O. did not respond to the Department's inquiries. Even after Tatlow explained to R.O. that he needed more information from

R.O. to determine if he was an appropriate caregiver for I.O., R.O. refused to cooperate and avoided the Department.

In its temporary orders, the trial court ordered R.O. to: (1) comply with the requirements of the family service plan; (2) submit to a drug and alcohol assessment; (3) submit to a psychological evaluation; (4) attend and cooperate fully in counseling sessions; and (5) participate in and successfully complete parenting classes. R.O. did not comply with any of these orders.

Zelaya, the initial caseworker, prepared a family service plan for R.O., requiring him to: (1) maintain legal and safe employment and verify it with the Department; (2) maintain safe and stable independent housing appropriate for I.O. and verify it with the Department; (3) actively participate in parenting classes; and (4) attend and participate in parent-child visits as ordered by the trial court. For the most part, R.O. did not satisfy these requirements. When Zelaya tried to meet with R.O. to review the family service plan with him, R.O refused to meet with her. R.O. told Zelaya he was not going to satisfy these requirements because he did not trust the Department. According to Zelaya, R.O. was uncooperative and it was "[e]xtremely difficult to get responses from him."

For the first thirteen months the case was pending—from December 2023 to December 2024—R.O. never visited I.O. Later in the case, between January 2025 and April 11, 2025, R.O. started visiting I.O. weekly. However, even during this short period, R.O. still missed three visits, including the last visit before trial. According to a caseworker, R.O. did well during his visits with I.O.

Before the case began, R.O. was charged with multiple crimes, including assault bodily injury, aggravated assault with a deadly weapon, aggravated sexual assault, unlawful carrying, and possession of a firearm by a felon. The evidence did not show if R.O. was ever convicted of any

of these crimes. While the case was pending, R.O. was charged with aggravated assault and aggravated kidnapping. These charges arose from the same incident as N.B.'s aggravated assault and aggravated kidnapping charges. According to Tatlow, R.O.'s criminal history raised concerns about his ability to care for I.O.

As to R.O.'s parenting abilities, N.B. testified that R.O. was "a great father." N.B. was troubled that R.O.'s parental rights were being terminated because he was "the non-offending" parent, "the kids love him," and "he's never done wrong by them, never." N.B. believed the children would be "the safest" with R.O. because "he's very protective."

After hearing the evidence, the trial court terminated N.B.'s parental rights on two statutory grounds: failure to comply with a court-ordered service plan and continued use of a controlled substance. *See* TEX. FAM. CODE § 161.001(b)(1)(O),(P).[7] The trial court terminated R.O.'s parental rights on two statutory grounds: constructive abandonment and failure to comply with a court-ordered service plan. *See id.* § 161.001(b)(1)(N),(O). The trial court also found that termination of each parent's parental rights was in the children's best interests and appointed the Department the children's permanent managing conservator. N.B. and R.O. appealed.

### N.B.'S APPEAL

On appeal, N.B. argues the evidence is legally and factually insufficient to support the trial court's statutory ground findings as well as its finding that termination of her parental rights was in the children's best interests. N.B. also argues the trial court abused its discretion by appointing the Department as the permanent managing conservator of the children.

---

[7]The Legislature recently amended the Texas Family Code to remove the failure to comply with a court-ordered service plan as a ground for terminating parental rights under section 161.001(b)(1). This amendment took effect on September 1, 2025. Because the trial court rendered its termination judgment before September 1, 2025, the failure to comply with a court-ordered service plan—formerly labeled (O)—was still an available ground for terminating parental rights. All references to section 161.001(b)(1) are to the former version of the statute.

### 1. Applicable Law and Standards of Review

To terminate parental rights pursuant to section 161.001 of the Texas Family Code, the Department has the burden to prove by clear and convincing evidence that parental rights should be terminated under at least one of the statutory grounds in subsection 161.001(b)(1) and that termination of parental rights is in the children's best interests. TEX. FAM. CODE § 161.001(b)(1), (2). In reviewing the legal sufficiency of the evidence to support these findings, we "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). In reviewing the factual sufficiency of the evidence, we consider disputed or conflicting evidence. *Id*. at 345. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id*. (quoting *In re J.F.C.*, 96 S.W.3d at 266). Under these standards, the factfinder is the sole judge of the weight and credibility of the evidence. *Id*. at 346. Accordingly, we defer to the factfinder's judgment regarding credibility determinations. *In re E.J.C.*, No. 04-23-00519-CV, 2023 WL 7367772, at *2 (Tex. App.—San Antonio Nov. 8, 2023, no pet.).

### 2. Continued Use of a Controlled Substance

At the time of trial, section 161.001(b)(1)(P) provided that a trial court may terminate a parent-child relationship if it finds by clear and convincing evidence that the parent "used a controlled substance . . . in a manner that endangered the health and safety of the child, and (i) failed to complete a court-ordered substance abuse program; or (ii) after completion of a court-ordered substance abuse treatment program, continued to use a controlled substance." *See* TEX.

FAM. CODE § 161.001(b)(1)(P). To terminate N.B.'s parental rights on ground (P), the Department was required to prove two elements: (1) endangerment, and (2) continued use of a controlled substance after treatment. *See In re R.R.A.*, 687 S.W.3d 269, 276 (Tex. 2024).

The endangerment element does not require that a parent's endangering conduct be directed at the child or that the child actually suffer injury. *Id*. at 277. "Instead, endangerment encompasses a larger array of conduct that 'expose[s a child] to loss or injury' or 'jeopardize[s]' the child." *Id*. (quoting *Tx. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). "This definition matches the ordinary meaning of endangerment, which does not require actual harm." *Id*. "A factfinder may infer endangerment from 'a course of conduct' that presents substantial risks . . . to the child's health and safety—the focus of ground (P)." *Id*. "Those risks can be developed by circumstances arising from and surrounding a parent's behavior." *Id*. "Such risks must be more than 'a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment.'" *Id*. (quoting *Boyd*, 727 S.W.2d at 534). "A court need not require physical injury from [risks created by a pattern of drug use] to materialize to find that the children's health and safety have been endangered by them; a pattern of drug use in such a context is evidence from which a factfinder may infer endangerment." *Id*. at 279. "A reviewing court should not evaluate drug-use evidence in isolation; rather, it should consider additional evidence that a factfinder could reasonably credit that demonstrates that illegal drug use presents a risk to the parent's 'ability to parent.'" *Id*. at 278.

As to the endangerment element, the evidence showed that N.B. used felony-level drugs while she was pregnant with I.O. and while she was T.I.P.'s primary caretaker. When I.O. was born, N.B. tested positive for amphetamines, and I.O. had amphetamines and methamphetamines in his system. After I.O.'s birth, the Department tried to develop a safety plan to protect the

children, but N.B. would not agree to a safety plan. N.B. also refused to allow the Department to interview T.I.P. early in the case. Based on this evidence, the trial court could have determined that N.B.'s illegal drug use impeded her ability to parent the children, exposed them to the risk of harm or injury, and jeopardized their health and safety. *See In re R.R.A.*, 687 S.W.3d at 279 (holding trial court could infer the manner of father's drug use endangered the children's health and safety when he "used felony-level drugs as the primary caregiver of the children"); *In re M.J.*, No. 14-20-00449-CV, 2020 WL 7038526, at *6 (Tex. App.—Houston [14th Dist.] Dec. 1, 2020, no pet.) ("[A] mother's drug abuse during pregnancy is particularly endangering to an unborn child's physical well-being."). Based on all the surrounding circumstances, the trial court could have reasonably concluded that N.B. used illegal drugs in a manner that endangered the children.

As to the continued use after treatment element, the evidence showed that after N.B. completed an outpatient drug treatment program in May 2024, she continued to use illegal drugs. The drug tests results showed that N.B. tested positive for amphetamines and methamphetamines on August 29, 2024, and N.B. testified that she used illegal drugs in July 2024. N.B. asserts in her brief that the Department "did not have any drug test results to confirm whether [she] was or was not using drugs since" she took her last drug test in August 2024. But after that time, N.B. repeatedly refused to submit to drug testing. Saldana, the second caseworker, testified that the Department requested drug testing from N.B. eight times between January 16, 2025, and March 15, 2025, but N.B. refused to participate in any of these drug tests. A parent's "failure to drug test is considered a positive test result under the law and supports an inference that she is still using drugs." *In re M.M.*, 2022 WL 1096381, at *4; *see In re A.M.L.*, No. 04-19-00422-CV, 2019 WL 6719028, at *4 (Tex. App.—San Antonio Dec. 11, 2019, pet. denied) (noting the trial court "could

have reasonably inferred that [parent's] failure to appear for drug testing indicated that [she] was avoiding testing because [she] was using drugs").

N.B. claimed that her participation in drug testing was hindered by a lack of transportation and conflicts with her work schedule. But the trial court could have disbelieved these claims. Zelaya testified that she offered to provide N.B. transportation to drug tests and to schedule her drug testing in the evening, but N.B. either refused these offers or did not respond to them. We must defer to the trial court's credibility determinations. *See In re E.J.C.*, 2023 WL 7367772, at *2. On this record, the trial court could have properly determined that N.B.'s failures to appear for drug testing meant that she was avoiding drug testing because she was using drugs. *See In re M.M.*, 2022 WL 1096381, at *4; *In re A.M.L.*, 2019 WL 6719028, at *4. In sum, the trial court could have reasonably concluded that even after completing a drug treatment program, N.B. continued to use illegal drugs.

N.B. argues the evidence is insufficient because she was "making a good faith effort to address" her illegal drug use, she "made significant strides in her recovery," and the Department failed "to provide adequate support for her recovery efforts." However, these arguments are irrelevant to this sufficiency review because the statute makes no mention of these factors. *See* TEX. FAM. CODE § 161.001(b)(1)(P). But even if N.B.'s arguments were relevant, the evidence did not establish N.B.'s good faith and progress or a lack of support from the Department. To the contrary, after completing a drug treatment program, N.B. tested positive for illegal drugs and refused to drug test. A caseworker arranged for N.B. to complete a second drug assessment, but N.B. refused to do so. Another caseworker discussed with N.B. the importance of demonstrating her sobriety and offered to provide her with transportation to drug testing and to schedule her drug testing in the evenings. Again, N.B. refused these offers. The Department also supported N.B.'s

participation in individual counseling by initiating counseling services with three separate counselors. When arranging counseling services with the third counselor, the caseworker ensured that the sessions would be virtual to accommodate N.B.'s work schedule.

After reviewing all the evidence in the light most favorable to the trial court's finding, we conclude a reasonable factfinder could have formed a firm belief or conviction that N.B. used a controlled substance in a manner that endangered the health and safety of the children, and that after completion of a court-ordered substance abuse treatment program, N.B. continued to use a controlled substance. Additionally, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is not so significant that a factfinder could not reasonably have formed a firm belief or conviction that termination of N.B.'s parental rights was in the children's best interest. We hold the evidence is legally and factually sufficient to support the trial court's (P) finding.[8] *See* TEX. FAM. CODE § 161.001(b)(1)(P); *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018).

### 3. Best Interests of the Children

Next, N.B. argues the trial evidence did not sufficiently establish that termination of her parental rights was in the children's best interests.

The best interest inquiry is "child-centered and focuses on the child's well-being, safety, and development." *In re A.C.*, 560 S.W.3d at 631; *see In re B.N.*, No. 09-22-00108-CV, 2022 WL 4546573, at *7 (Tex. App.—Beaumont Sept. 29, 2022, no pet.) ("In a best-interest analysis, courts focus on the best interest of the child, not the best interest of the parent.").

---

[8] Because the evidence is sufficient to support the trial court's finding under (P), we need not address N.B.'s challenge to the trial court's finding under (O). *See* TEX. R. APP. P. 47.1.

The law presumes that a child's best interest is served by keeping him with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). However, the law also presumes that the prompt and permanent placement of the child in a safe environment is in his best interest. TEX. FAM. CODE § 263.307(a). When determining if a parent is willing and able to provide a child with a safe environment, the trial court should consider the relevant factors contained in section 263.307(b). *See id*. § 263.307(b).[9] A factfinder may also consider the factors articulated by the Texas Supreme Court in *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).[10] "The *Holley* factors are neither all-encompassing nor does a court need to find evidence of each factor before terminating the parent-child relationship." *In re E.A.R.*, 672 S.W.3d 716, 721–22 (Tex. App.—San Antonio 2023, pet. denied). Evidence supporting the statutory grounds for termination may be probative of the child's best interest. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). In determining whether termination of the parent-child relationship is in the child's best interest, a factfinder may judge a parent's

---

[9]These factors include (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the Department; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with: (A) minimally adequate health and nutritional care; (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development; (C) guidance and supervision consistent with the child's safety; (D) a safe physical home environment; (E) protection from repeated exposure to violence even though the violence may not be directed at the child; and (F) an understanding of the child's needs and capabilities; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child. TEX. FAM. CODE § 263.307(b).

[10]These factors include, but are not limited to, the following: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the child's best interest; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions that may indicate the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *In re E.C.R.*, 402 S.W.3d 239, 249 n.9 (Tex. 2013) (citing *Holley*, 544 S.W.2d at 371-72).

future conduct by her past conduct. *In re Z.R.M.*, 665 S.W.3d 825, 829 (Tex. App.—San Antonio 2023, pet. denied).

"Parental drug abuse, which reflects poor judgment, is . . . a factor that may be considered when determining the child's best interest." *In re M.C.*, 482 S.W.3d 675, 688 (Tex. App.—Texarkana 2016, pet. denied). "[A] parent's illegal drug use exposes the child to the possibility that the parent may be impaired or imprisoned." *In re T.N.J.J.*, No. 04-19-00228-CV, 2019 WL 6333470, at *5 (Tex. App.—San Antonio Nov. 27, 2019, no pet.). "Thus, a parent's illegal drug use is also relevant to whether a parent can provide [her] children with consistency and stability." *Id*. "Drug use can destabilize the home and expose children to physical and emotional harm if not resolved." *In re J.J.V.M.M.*, No. 04-22-00405-CV, 2022 WL 17479144, at *5 (Tex. App.—San Antonio Dec. 7, 2022, no pet.). "This court has recognized that a parent's frequent or long-term drug use is relevant to a best interest determination, and it can support a factfinder's firm belief or conviction that termination of [a parent's] parental rights is in the children's best interest." *In re A.F.*, No. 04-20-00216-CV, 2020 WL 6928390, at *3 (Tex. App.—San Antonio Nov. 25, 2020, no pet.).

The evidence in this case showed that N.B. had been involved in long-term use of felony-level drugs. As even N.B. acknowledged in her testimony, her positive drug test results and her refusal to work with the Department to develop a safety plan for the children were the reasons for the children's removal from her home. Two caseworkers and two counselors made it clear to N.B. that she needed to stop using illegal drugs, but N.B. did not alter her behavior. Even after N.B. completed an outpatient drug treatment program, she sometimes tested positive for illegal drugs and refused to drug test. From these refusals, the trial court could have inferred that N.B. refused to drug test because she was using illegal drugs. *See In re M.M.*, 2022 WL 1096381, at *4; *In re*

*A.M.L.*, 2019 WL 6719028, at \*4. Based on the evidence, the trial court could have reasonably determined that N.B. used illegal drugs during the pendency of this case. A parent's drug use and failures to submit to drug testing and participate in drug treatment during the pendency of a parental termination case "are relevant to multiple *Holley* factors, including the emotional and physical needs of the children now and in the future, the emotional and physical danger to the children now and in the future, [a parent's] parental abilities, the stability of [the parent's] home, and the acts or omissions which may indicate the existing parent-child relationship is not a proper one." *In re T.N.J.J.*, 2019 WL 6333470, at \*5.

The evidence further showed that N.B. was either unwilling or unable to provide the children with a safe environment based on various factors in section 263.307(b), including her ongoing use of illegal drugs, her inability to accept and complete counseling services, her inability to cooperate with and facilitate the Department's close supervision, and her inability to effect positive environmental and personal changes within a reasonable period of time. *See* TEX. FAM. CODE § 263.307(b).

As to the stability of T.I.P. and I.O.'s placements, the children lived in multiple placements while the case was pending. Initially, they lived with a maternal relative in Houston for five months. Next, the children lived with R.O.'s mother for a couple of months until that placement "fell apart." Thereafter, T.I.P. and I.O. lived in different placements. At the end of February 2025, T.I.P.'s status was "child without placement," while I.O. was living in a foster home. By the time of trial, T.I.P. was placed at "Star Ranch," and I.O. was placed in a foster home. With regard to T.I.P.'s health, the evidence showed that T.I.P. participated in a drug assessment and counseling services while the case was pending.

As to the Department's plans for permanency, a caseworker testified that the Department's permanency goal for the children was adoption by a non-relative. The day before trial, the Department learned of a new potential placement for both children. A friend of a family member, L.B., stated she was willing to have the children placed with her "pending a home study." L.B. was a registered nurse, who lived and worked in San Antonio. Additionally, the children's attorney and guardian ad litem advised the trial court that T.I.P. wanted to return to San Antonio and to be placed with L.B.[11]

The Department's lack of concrete plans for the children's future is not determinative of the best-interest inquiry. As the Texas Supreme Court has stated:

> Evidence about placement plans and adoption are, of course, relevant to best interest. However, the lack of evidence about definitive plans for permanent placement and adoption cannot be the dispositive factor; otherwise, determinations regarding best interest would regularly be subject to reversal on the sole ground that an adoptive family has yet to be located. Instead, the inquiry is whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that termination of the parent's rights would be in the child's best interest—even if the agency is unable to identify with precision the child's future home environment.

*In re C.H.*, 89 S.W.3d at 28. Thus, the lack of a definite, permanent placement for T.I.P. and I.O. by trial does not render the evidence insufficient to support the trial court's findings that termination was in the children's best interests. *See id*.

After reviewing all the evidence in the light most favorable to the trial court's findings, we conclude a reasonable factfinder could have formed a firm belief or conviction that the termination of N.B.'s parental rights was in the children's best interests. Additionally, the disputed evidence that a reasonable factfinder could not have credited in favor of the findings is not so significant that a factfinder could not reasonably have formed a firm belief or conviction that termination of

---

[11]N.B.'s attorney did not object to the children's attorney and guardian ad litem relaying T.I.P.'s desires to the trial court. *See Banda v. Garcia*, 955 S.W.2d 270, 272 (Tex. 1997) (holding attorney's unsworn statements tendered as evidence were sufficient absent objection).

N.B.'s parental rights was in the children's best interests. We hold the evidence is legally and factually sufficient to support the trial court's best-interest findings. *See In re A.C.*, 560 S.W.3d at 631.

### 4. Managing Conservatorship

N.B. argues that if we reverse the trial court's termination judgment on appeal, we should reverse the trial court's conservatorship order. However, we have concluded the trial court did not err in terminating N.B.'s parental rights. Accordingly, N.B. cannot challenge the part of the judgment appointing the Department the children's managing conservator. *See In re L.L.Y.B.*, No. 04-24-00426-CV, 2024 WL 5151156, at *8 (Tex. App.—San Antonio Dec. 18, 2024, no pet.) (holding mother could not challenge the appointment of the Department as the children's managing conservator when the trial court did not err in terminating her parental rights); *In re L.T.P.*, No. 04-17-00094-CV, 2017 WL 3430894, at *6 (Tex. App.—San Antonio Aug. 9, 2017, pet. denied) (holding that because the trial court did not err in terminating appellant's rights, appellant no longer had any legal rights to her child and could not challenge the portion of the termination order that related to the appointment of conservators).

**R.O.'S APPEAL**

R.O. argues that the evidence is legally and factually insufficient to support the trial court's constructive abandonment and best interest findings.

### 1. Statutory Grounds

The trial court terminated R.O.'s parental rights on two statutory grounds: constructive abandonment and failure to comply with a court-ordered service plan. *See* TEX. FAM. CODE § 161.001(b)(1)(N),(O). In his brief, R.O. argues the evidence is legally and factually insufficient to support the trial court's constructive abandonment finding; however, R.O. does not challenge the

trial court's finding that he failed to comply with a court-ordered service plan, which at the time was a valid statutory ground for termination.

The Department argues, and we agree, that R.O. has waived any challenge to the statutory grounds supporting the termination judgment by failing to attack both the (N) and the (O) findings. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) ("Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest.); *In re R.T.*, No. 09-15-00425-CV, 2016 WL 821844, at *7 (Tex. App.—Beaumont Mar. 3, 2016, no pet.) ("Because the unchallenged finding under subsection O supports the order of termination, we need not reach Father's issue regarding the sufficiency of the evidence under subsection Q.").

Here, because the unchallenged (O) finding supports the trial court's termination judgment, we need not address R.O.'s contention that the evidence is legally and factually insufficient to support the (N) finding. *See In re A.V.*, 113 S.W.3d at 362; *In re R.T.*, 2016 WL 821844, at *7.

### 2. Best Interest of the Child

Many factors may be relevant to a child's best interest. *See In re C.H.*, 89 S.W.3d at 28; *In re E.A.R.*, 672 S.W.3d at 721–22. The trial court may consider the non-exclusive *Holley* factors in determining the child's best interest. *In re E.A.R.*, 672 S.W.3d at 721–22. The trial court may also consider the factors contained in section 263.307(b), which pertain to a parent's willingness and ability to provide the child with a safe environment. *See* TEX. FAM. CODE § 263.307(b). However, neither the *Holley* factors nor the statutory factors are exhaustive, and evidence of a single factor may be sufficient for a factfinder to form a reasonable belief or conviction that termination is in the child's best interest. *In re J.J.V.M.M.*, 2022 WL 17479144, at *5. The same evidence that supports the statutory grounds for termination may also support a best-interest finding. *In re C.H.*,

89 S.W.3d at 28. The trial court may judge a parent's future conduct by his past conduct. *In re Z.R.M.*, 665 S.W.3d at 829. A best-interest analysis may consider direct and circumstantial evidence, subjective factors, and the totality of the evidence. *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied).

Prior to I.O.'s birth, N.B. and R.O. lived together, which supports an inference that R.O. was aware of N.B.'s illegal drug usage while she was pregnant with I.O. The trial court could have reasonably determined that R.O.'s failure to protect I.O. from the effects of N.B.'s illegal drug use endangered I.O.'s physical health and well-being. *See In re J.W.*, 645 S.W.3d 726, 749 (Tex. 2022) ("[S]everal courts of appeals have held that a parent's knowledge of the other parent's drug use during pregnancy and corresponding failure to attempt to protect the unborn child from the effects of that drug use can contribute to an endangering environment."); *In re H.M.J.*, No. 06-18-00009-CV, 2018 WL 3028980, at *5 (Tex. App.—Texarkana June 19, 2018, no pet.) ("A father's failure to attempt to protect his unborn child from the mother's drug use during her pregnancy constitutes an omission that is both legally and factually sufficient to support a trial court's finding that the father had endangered the child.").

After I.O.'s birth, R.O. made almost no effort to be involved in I.O.'s life. When I.O. was removed because of N.B.'s illegal drug use, R.O. did not step in to care for his child. The Department investigator, Tatlow, testified that when he visited N.B. at her home immediately after I.O.'s birth, R.O. hid in a bedroom and refused to come out to meet him. After I.O.'s removal, R.O. called Tatlow and questioned him about I.O.'s removal. R.O. also threatened to sue the Department. In response, Tatlow explained to R.O. that the Department knew nothing about him, and that R.O. needed to participate in an assessment to assist the Department in determining if he

was an appropriate caregiver for I.O. But even after Tatlow's explanation, R.O. continued to avoid the Department and refused to cooperate with caseworkers.

For a thirteen-month period—from December 2023 to December 2024—R.O. failed to attend visits with I.O. When a caseworker offered to provide R.O. transportation to these visits, R.O. refused to provide his physical address. Three months before trial, R.O. started attending weekly visits with I.O. However, because these visits occurred shortly before trial, the trial court could have reasonably disregarded them. "[T]he factfinder may conclude that a parent's changes shortly before trial are too late to have an impact on the best-interest determination." *In re S.R.*, 452 S.W.3d 351, 368 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

The evidence showed that R.O. was either unwilling or unable to provide I.O. with a safe environment based on multiple section 263.307(b) factors, including his inability to cooperate with and facilitate the Department's close supervision, his inability to accept and complete counseling services, his inability to effect positive environmental and personal changes within a reasonable period of time, and his inability to demonstrate adequate parenting skills by providing I.O. with care and nurturance and a safe physical home environment. *See* TEX. FAM. CODE § 263.307(b).

Based on the totality of the evidence, the trial court could have reasonably determined that R.O. was indifferent to his parental rights and responsibilities. "[I]ndifference is inimical to the parent–child relationship. Hence, significant evidence of parental indifference weighs heavily in favor of a factfinder's finding that termination is in a child's best interest." *In re A.J.D.-J.*, 667 S.W.3d 813, 823 (Tex. App.—Houston [1st Dist.] 2023, no pet.).

In arguing that the evidence is legally and factually insufficient to support the trial court's best-interest finding, R.O. asserts that the evidence is insufficient because it does not show that he posed a danger to I.O.'s emotional or physical well-being. We disagree. As previously discussed,

the evidence showed that R.O. did not protect I.O. from N.B.'s illegal drug use while she was pregnant with I.O., and R.O. neglected to participate in visits with I.O. until shortly before trial.

R.O. further asserts that the evidence is insufficient because there was no evidence that he ever used illegal drugs. Again, we disagree. The trial court could have considered other factors in evaluating I.O.'s best interest, including R.O.'s inability or unwillingness to cooperate with the Department and his failure to visit I.O. over a thirteen-month period. *See In re J.J.V.M.M.*, 2022 WL 17479144, at *5 (explaining that a best interest finding does not require proof of any particular factor). Furthermore, the Department never had an opportunity to evaluate R.O.'s sobriety because he refused to participate in a drug and alcohol assessment and drug testing.

R.O. next asserts the evidence is insufficient to support the best-interest finding because the record is "nearly silent as to the circumstances of I.O.'s current foster placement or any future placement." The evidence showed that I.O. was currently living in a foster home and that a new person, L.B., was interested in providing I.O. with a long-term placement. In contrast, the evidence showed that for the entire seventeen months the case was pending, R.O. never provided I.O. with consistency and stability. While the Department did not have definite plans for a permanent placement for I.O., "the inquiry is whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that termination of the parent's rights would be in the child's best interest—even if the agency is unable to identify with precision the child's future home environment." *In re C.H.*, 89 S.W.3d at 28.

Finally, the record shows that R.O. did not attend the trial in person or by Zoom. Although R.O. was represented by counsel at trial, the record does not reveal the reason for R.O.'s failure to attend trial. "When a parent fails to attend trial in a parental-termination case without a valid excuse

for his or her failure to do so, the factfinder may reasonably infer that the parent is indifferent to the outcome." *In re A.J.D.-J.*, 667 S.W.3d at 826.

After reviewing all the evidence in the light most favorable to the trial court's finding, we conclude a reasonable factfinder could have formed a firm belief or conviction that the termination of R.O.'s parental rights was in I.O.'s best interest. Additionally, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is not so significant that a factfinder could not reasonably have formed a firm belief or conviction that termination of R.O.'s parental rights was in I.O.'s best interest. We hold the evidence is legally and factually sufficient to support the trial court's best-interest finding. *See In re A.C.*, 560 S.W.3d at 631.

## CONCLUSION

We affirm the trial court's judgment.

Adrian A. Spears II, Justice